**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard, 16th Floor
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Wingate Inns International, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WINGATE INNS INTERNATIONAL, INC., a Delaware Corporation, | : |
| | : |
| Plaintiff, | : Civil Action No. 15- |
| | : |
| v. | : **COMPLAINT** |
| | : |
| HERMIS CORPORATION, a Virginia Corporation; BHARAT SHAH, an individual; ASHOK PATEL, an individual; VINOD TREHAN, an individual; DHARM BAINS, an individual; GOPINATH JADHAV, an individual; HARRY BAWA, an individual; MAHENDRA AMIN, an individual; and MONA B. PATEL, an individual, | : |
| Defendants. | |

Plaintiff Wingate Inns International, Inc., by its attorneys, LeClairRyan, complaining of defendants Hermis Corporation, Bharat Shah, Ashok Patel, Vinod Trehan, Dharm Bains, Gopinath Jadhav, Harry Bawa, Mahendra Amin, and Mona B. Patel, says:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Wingate Inns International, Inc., ("WII") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Defendant Hermis Corporation ("Hermis"), on information and belief, is a corporation organized and existing under the laws of the State of Virginia, with its principal place of business at 441 Rivergate Drive, Richmond, Virginia 23238.

3.      Defendant Bharat Shah ("B. Shah"), on information and belief, is a principal of Hermis and a citizen of the State of Virginia, having an address at 2607 Annakay Crossing, Midlothian, Virginia 23113.

4.      Defendant Ashok Patel ("A. Patel"), on information and belief, is a principal of Hermis and a citizen of the State of Virginia, having an address at 11850 Aberdeen Landing Lane, Midlothian, Virginia 23113.

5.      Defendant Vinod Trehan ("V. Trehan"), on information and belief, is a principal of Hermis and a citizen of the State of Virginia, having an address at 3820 Reeds Landing Circle, Midlothian, Virginia 23113.

6.      Defendant Dharm Bains ("D. Bains"), on information and belief, is a principal of Hermis and a citizen of the State of Michigan, having an address at 264 Brentwood Drive, Battlecreek, Michigan 49015.

7.      Defendant Gopinath Jadhav ("G. Jadhav"), on information and belief, is a principal of Hermis and a citizen of the State of Virginia, having an address at 9805 Springbrook Court, Richmond, Virginia 23229.

8.      Defendant Harry Bawa ("H. Bawa"), on information and belief, is a principal of Hermis and a citizen of the State of Virginia, having an address at 441 Rivergate Drive, Richmond, Virginia 23238.

9.     Defendant Mahendra Amin ("M. Amin"), on information and belief, is a principal of Hermis and a citizen of the State of Michigan, having an address at 6918 Trotwood Street, Portage, Michigan 49024.

10.     Defendant Mona B. Patel ("M. Patel"), on information and belief, is a principal of Hermis and a citizen of the State of Georgia, having an address at 2938 Holly Pointe Circle, Marietta, Georgia 30062.

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

12.     This Court has personal jurisdiction over Hermis by virtue of, among other things, section 17.4 of the December 30, 1998 franchise agreement by and between Hermis and WII (the "Franchise Agreement"), described in more detail below, pursuant to which Hermis has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

13.     This Court has personal jurisdiction over B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel acknowledged that they were personally bound by section 17 of the Franchise Agreement.

14.     Venue is proper in this District pursuant to section 17.4 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Hermis of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

15.    On or about December 30, 1998, WII entered into the Franchise Agreement with Hermis for the operation of a 130-room Wingate® guest lodging facility located at 3940 Centerview Drive, Chantilly, Virginia 20151, Site No. 11962-84569-01 (the "Facility").  A true copy of the Franchise Agreement is attached hereto as Exhibit A.

16.    Pursuant to section 5 of the Franchise Agreement, Hermis was obligated to operate a Wingate® guest lodging facility for a twenty-year term.

17.    By amendment dated October 28, 2013, a true copy of which is attached hereto as Exhibit B, the parties agree to extend the term of the Franchise Agreement to January 1, 2026.

18.    Pursuant to section 7, section 18.2[1], and Schedule C of the Franchise Agreement, Hermis was required to make certain periodic payments to WII for royalties, system assessment fees, taxes, interest, reservation system user fees, and other fees (collectively, "Recurring Fees").

19.    Pursuant to section 7.3 of the Franchise Agreement, Hermis agreed that interest is payable "on any past due amount payable to [WII] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

20.    Pursuant to section 3.9 of the Franchise Agreement, Hermis was required to prepare and submit monthly reports to WII disclosing, among other things, the amount of gross room revenue earned by Hermis at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to WII.

---

[1] By amendment dated October 11, 2011, a true copy of which is attached hereto as Exhibit C, section 18.2 was added to the Franchise Agreement to modify Hermis' Recurring Fees under the Franchise Agreement.

4

21.     Pursuant to section 3.9 of the Franchise Agreement, Hermis agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the Franchise Agreement, Hermis agreed to allow WII to examine, audit, and make copies of the entries in these books, records, and accounts.

22.     Pursuant to section 11.2 of the Franchise Agreement, WII could terminate the Franchise Agreement, with notice to Hermis, if Hermis (a) discontinued operating the Facility as a Wingate® guest lodging establishment and/or (b) lost possession or the right to possession of the Facility.

23.     Pursuant to section 17.4 of the Franchise Agreement, Hermis agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

24.     In connection with the Franchise Agreement, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel provided WII with a Guaranty[2] of Hermis' obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit E.

25.     Pursuant to the terms of the Guaranty, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel agreed, among other things, that upon a default under the Franchise Agreement, they would "immediately make each payment and perform or cause

---

[2] By amendment dated March 12, 2007, a true copy of which is attached hereto as Exhibit D, the parties amended Schedule B of the Franchise Agreement to reflect Hermis' new ownership breakdown and to revise the original Guaranty to the Franchise Agreement.

[Hermis] to perform, each unpaid or unperformed obligation of [Hermis] under the [Franchise] Agreement."

26.     Pursuant to the terms of the Guaranty, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by WII in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

27.     On or about December 30, 1998, Hermis made, and B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, and M. Amin co-made, a Development Advance Note in the amount of $250,000.00 (the "Development Note").  A true copy of the Development Note is attached hereto as Exhibit F.

28.     Pursuant to the terms of the Development Note, on each anniversary of the Facility's opening date, one-fifteenth ($1/15^{th}$) of the original principal amount would be forgiven without payment.

29.     The Development Note provides that if a termination or transfer of the Franchise Agreement occurs for any reason, "the outstanding principal balance of this [Development] Note shall be immediately due and payable without further notice, demand or presentment."

30.     Pursuant to the terms of the Development Note, if the Development Note is not paid within 10 days after it is due, the outstanding principal balance shall bear simple interest at a rate equal to the lesser of eighteen percent (18%) per annum or the highest rate allowed by applicable law.

31.     The Development Note also provides that "[i]f this [Development] Note is collected by or through an attorney at law, [WII] shall be entitled to collect reasonable attorneys' fees and all costs of collection."

32.     Pursuant to the October 28, 2013 amendment, the parties agreed that WII would provide Hermis with an account credit of $150,000.00 provided Hermis, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel executed a Promissory Note (the "Promissory Note") in the amount of $150,000.00.  See Exhibit B.

33.     On or about October 28, 2013, Hermis made, and B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel co-made, the Promissory Note in the amount of $150,000.00.  A true copy of the Promissory Note is attached hereto as Exhibit G.

34.     Pursuant to the terms of the Promissory Note, on the first of each year for a period of five years commencing on January 1, 2021, one-fifth (1/5th) of the original principal amount would be forgiven without payment.

35.     Pursuant to the October 28, 2013 amendment, the Promissory Note would not be subject to repayment unless the Franchise Agreement terminated before the end of the term of the Franchise Agreement, or a transfer of the Franchise Agreement occurred.  See Exhibit B.

36.     Pursuant to the terms of the Promissory Note, if the Promissory Note is not paid within 10 days after it is due, the outstanding principal balance shall bear simple interest at a rate equal to the lesser of eighteen percent (18%) per annum or the highest rate allowed by applicable law.

37.     The Promissory Note also provides that "[i]f this [Promissory] Note is collected by or through an attorney at law, [WII] shall be entitled to collect reasonable attorneys' fees and all costs of collection."

**The Defendants' Defaults and Termination**

38.     On or around April 22, 2014, Hermis lost possession of the Facility to a third party.

39.     Since losing possession of the Facility, Hermis, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel have failed to pay the outstanding principal balance of the Development Note and the Promissory Note to WII.

## FIRST COUNT

40.     WII repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 39 of the Complaint.

41.     On or about December 30, 1998, Hermis made, and B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, and M. Amin co-made, the Development Note in the amount of $250,000.00.

42.     Pursuant to the terms of the Development Note, on each anniversary of the Facility's opening date, one-fifteenth (1/15th) of the original principal amount would be forgiven without payment.

43.     The Development Note provides that if a termination or transfer of the Franchise Agreement occurs for any reason, "the outstanding principal balance of this [Development] Note shall be immediately due and payable without further notice, demand or presentment."

44.     On or around April 22, 2014, Hermis lost possession of the Facility to a third party.

45.     At the time Hermis lost possession of the Facility, the outstanding principal balance of the Development Note totaled $33,333.33.

46.     Hermis, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, and M. Amin's failure to make the agreed payment on the Development Note constitutes a breach of the Development Note and has damaged WII.

8

47.     Hermis, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, and M. Amin's failure to make the agreed payment on the Development Note constitutes unjust enrichment and has damaged WII.

**WHEREFORE**, WII demands judgment against Hermis, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, and M. Amin for damages in the amount of the principal sum of $33,333.33 due and owing under the Development Note, together with interest, attorneys' fees, and costs of suit.

## SECOND COUNT

48.     WII repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 47 of the Complaint.

49.     On or about October 28, 2013, Hermis made, and B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel co-made, the Promissory Note in the amount of $150,000.00.

50.     Pursuant to the terms of the Promissory Note, on the first of each year for a period of five years commencing on January 1, 2021, one-fifth (1/5th) of the original principal amount would be forgiven without payment.

51.     Pursuant to the October 28, 2013 amendment, the Promissory Note would not be subject to repayment unless the Franchise Agreement terminated before the end of the term of the Franchise Agreement, or a transfer of the Franchise Agreement occurred.  See Exhibit B.

52.     On or around April 22, 2014, Hermis lost possession of the Facility to a third party.

53.     To date, the remaining outstanding principal balance of the Promissory Note is $137,796.65.

54.     Despite their obligation to do so, Hermis, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel have failed to make the payment due and owing to WII under the Promissory Note.

55.     Hermis, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel's failure to make the agreed payment on the Promissory Note constitutes a breach of the Promissory Note and has damaged WII.

56.     Hermis, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel's failure to make the agreed payment on the Promissory Note constitutes unjust enrichment and has damaged WII.

**WHEREFORE**, WII demands judgment against Hermis, B. Shah, A. Patel, V. Trehan, D. Bains, G. Jadhav, H. Bawa, M. Amin, and M. Patel for damages in the amount of the outstanding principal sum of $137,796.65 due and owing under the Promissory Note, together with interest, attorneys' fees, and costs of suit.

**LeClairRyan**
Attorneys for Plaintiff,
Wingate Inns International, Inc.

By:_____
**Bryan P. Couch**

Dated: 1/22/15

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**LeClairRyan**
Attorneys for Plaintiff,
Wingate Inns International, Inc.

By:_____
       **Bryan P. Couch**

Dated: 1/22/15

# EXHIBIT A

Location: **Chantilly, VA**
Entity No. _____
Unit No.: _____

## WINGATE INN
## FRANCHISE AGREEMENT

     THIS FRANCHISE AGREEMENT ("Agreement"), dated _Dec 30_, 19 _98_, is between WINGATE INNS INTERNATIONAL, INC., a Delaware corporation ("we", "our" or "us"), and **Hermis Corporation**, a _____ corporation ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Wingate Inn" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The License is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Wingate Inn." You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion.

**2. Protected Territory.** We will not own, operate, lease, manage, or license anyone but you to operate a Wingate Inn in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that there are no express or implied territorial rights or agreements between the parties except as stated in this Section.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** You will select and acquire the Location and acquire, design, construct, equip and supply the Facility in accordance with Approved Plans, Schedule B and System Standards. You will provide proof of ownership or a ground lease of the Location on or before January 1, 1999. You will commence construction of the Facility on or before November 1, 1999, and complete construction on or before December 31, 2000. Your general contractor or you must carry the insurance required under this Agreement during construction. We may, at our option, terminate this Agreement by written notice to you if you do not meet these deadlines. We may, in our sole discretion, grant extensions of time to perform any phase of the Improvement Obligation. You will pay us an extension fee equal to $67.00 times the number of days of any extension of the deadline for opening the Facility.

WINEXHCT 5/98
51923

1

This Fee will be payable to us after each 30 days of the extension. You will pay us any extension fee outstanding when the Facility opens 10 days after the Opening Date. The Initial Fee described in Section 6 is not refundable. Construction commences, for purposes of this Section, when all of the following occur: (x) We approve a site plan, completed working drawings and detail specifications for the Facility; (y) Governmental permits are issued to commence foundation construction; and (z) You commence pouring concrete for building footings.

3.2 **Improvement Plans.** Within 15 days after the Effective Date, we will deliver to your architect a complete set of our Basic Plans. Your architect and you will create construction documents (including a project manual and working drawings) for the Facility based upon the Basic Plans, System Standards and this Agreement (particularly Schedule B), and then submit them for our approval before starting improvement of the Location. Your architect must certify to us and to you that the plans and specifications created from the Basic Plans comply with the design requirements of the Americans with Disabilities Act ("ADA"), the Department of Justice Standards for Accessible Design ("ADAAG") under that Act, and all codes that apply. We will not unreasonably withhold or delay our approval, which is intended only to assure that no unnecessary deviation from the Basic Plans is proposed, and to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like, who must exercise their own independent professional care, skill and diligence in the design and construction of your Facility. Our review does not cover technical, architectural or engineering factors relating to the Location and adaptation of the Basic Plans for the Facility you want to build, or compliance with federal, state or local laws, regulations or code requirements, for which your architect is responsible. We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after construction or any subsequent renovation. Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice. We may direct you to change the work in progress if it deviates from the Approved Plans or System Standards. We may terminate this Agreement if you fail to comply with any such direction.

3.3 **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval, or as permitted under and strictly in accordance with the System Standards Manual. You may not open the Facility until we inspect it and determine that the Facility meets our Standards and we receive from you and your architect or contractor a written certificate stating that the Facility as built conforms to the Approved Plans and the design requirements of ADA, ADAAG and all applicable codes.

3.4 **Operation.** You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or

portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool (if any) and other guest service facilities may not be shared with or used by guests of another lodging or housing facility. Unless System Standards permit otherwise, you will not charge guests for local telephone calls made from guest room telephones or charge guests any access fee or surcharge on long distance telephone calls made from guest room telephones. You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is material.

3.5 **Training.** You (or a person with executive authority if you are an entity) and the Facility's manager will attend the training programs described in Section 4.1 we designate as mandatory for franchisees or managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility. You will direct the Facility staff to attend the Property Training Program described in Section 4.1.2.

3.6 **Marketing.** You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.1 You will participate in any frequent guest rewards program we determine is appropriate and pay the Special Marketing Assessment associated with the program, under the terms approved by either majority vote of the Franchisees of all Chain Facilities that will be required to participate in the program or the board of directors of a franchisee advisory association, if then in existence.

3.6.2 You may participate in any regional marketing, training or management alliance or cooperative of Chain franchisees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.7 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

3.8 **Inspections and Audits.** You will permit our representatives to perform quality assurance

WINEXHCI-S/08
S1073

inspections of the Facility and audit your financial and operating books and records (including tax returns) particularly those relating to the Facility and any related business, with or without prior notice of the inspection or audit. The inspections and audits will commence during normal business hours, although we may observe Facility operation and accounting activity at any time. You, the Facility staff and your other agents and employees will cooperate with our inspectors and auditors in the performance of their duties. We may access via telephone datalink any data or reports you maintain on the Facility's property management system as part of the audit process, but we will not interfere with the operation of that system while we are in electronic communication with it. You will pay us any underpayment of, and we will pay you or credit your Recurring Fee account for any overpayment of, Recurring Fees discovered by an audit. If the Facility does not pass an inspection, you refuse to cooperate with our inspectors or our auditors when they arrive for an audit at a time scheduled at least 3 business days in advance or the audit reveals that you paid us less than 97% of the correct amount of Recurring Fees for a fiscal year or longer, you will pay us the Audit Fee described in Section 4.8, or the reasonable costs of travel, lodging and meal expenses for reinspection and any reinspection fee we may impose. We may publish or disclose the results of quality assurance inspections.

3.9 **Reports and Accounting.** You will prepare and submit timely Monthly Reports containing the information we require about the Facility's performance during the preceding month. You will prepare and submit other reports and information about the Facility as we may reasonably request from time to time or in the System Standards Manual. You will prepare and maintain any reports required under the System Standards Manual in the Facility's property management computer system including the name and address of Facility guests, if collected, and send them to us or allow us to access them by means of a telephone datalink. You will allow us access to the reports and data stored on the Facility's property management system via telephone, provided that we will not unreasonably interfere with normal functioning of the property management system while we are in electronic communication. You will maintain accounting books and records in accordance with generally accepted accounting principles and the American Hotel & Motel Association Uniform System of Accounts for Hotels, as amended, subject to this Agreement and other reasonable accounting standards we may specify from time to time. You will prepare and submit to us if we so request your annual and semi-annual financial statements. We do not require that your financial statements be independently audited, but you will send us a copy of your audited statements if you have them audited and we ask for them.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name as additional insureds Wingate Inns International, Inc., Cendant Finance Holding Corporation, Cendant Corporation, and their successors and assigns.

3.11 **Conferences.** You (or your representative with executive authority if you are an entity) will attend each annual Chain conference and pay the Conference Fee we set for the Chain franchisees, if and when we determine to hold an annual Chain conference. Mandatory recurrent training for franchisees and managers described in Section 4.1.3 may be held at a conference. The fee will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Wingate Inn" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities, including such programs as the free expanded continental breakfast, express check-in/check out, and children stay free in the guest room with parents. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14 **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add once the Facility has 100 rooms. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15 **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16 **Material Renovations.** Beginning five years after the Opening Date, we may issue a "Material Renovation Notice" to you that will specify a Material Renovation for the Facility, to be commenced no sooner than 90 days after the notice is issued. You will perform the Material Renovations as and when the Material Renovation Notice requires. We will not issue a Material Renovation Notice within five years after the date of a prior Material Renovation Notice.

3.17 **Technology Standards.** You recognize that the Wingate Inn System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment. We may modify System Standards to require new technology at all Chain Facilities.

4. **Our Operating and Service Obligations.** We will provide you with the following services and assistance:

4.1 **Training.** We will offer hospitality management training, property opening, recurrent training and supplemental training.

4.1.1 **Management Training.** No less than 60 days before the projected Opening Date, we will offer at a location in the United States we designate, and you or a person with executive authority if you are

an entity and a Facility manager (usually the general manager) must complete, a training program to our satisfaction. The training program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We may charge you a reasonable fee for materials for each manager trainee. Any replacement general manager of the Facility must complete the training program within the time specified in the System Standards Manual. No tuition will be charged for your first participation in this training but you must pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits. We may charge you reasonable tuition for training for replacement general managers.

4.1.2 **Property Opening Training.** We will provide at the Facility a "Property Training Program" (at our discretion as to length and scheduling) to assist you in opening the Facility and Training each Facility department. There is no charge for the initial Property Training Program. You must provide lodging for the trainers at your expense. You will pay the cost of any site used if the Facility is not available. We may require refresher training if the Facility does not meet Operations Standards. You must pay the reasonable travel, lodging, meal and out-of-pocket expenses incurred by our trainers for refresher training.

4.1.3 **Recurrent Training.** We will provide training for you and the Facility's manager if we determine that additional training for franchisees and managers is necessary from time to time. Training will be held in our U.S. training center or other locations. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits for this training. We may assess you a reasonable charge for course materials. This training may be held in conjunction with a Chain conference.

4.1.4 **Supplemental Training.** We may offer optional training programs without charge or for tuition. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices.

4.1.5 **Franchisee Orientation Training.** We may conduct, and you (or a person with executive authority if you are an entity) will attend a franchisee orientation program to familiarize you with the System, the Chain, and our services before or within 30 days after the Opening Date. The program will be no longer than five days.

4.1.6 **Cancellation Fees and Tuition.** We may charge you a reasonable cancellation fee if you cancel your training program commitments or reservations within 30 days (or such shorter period as we may specify) before the start of any training program at which you or your representative has a reservation. We may charge you reasonable tuition for your representatives to attend mandatory sessions other than those people we require to attend the training and fees for instructional materials.

4.2 **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion, beginning 30 days before the first Chain Facility opens. We will use the System Assessment Fee for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if your Recurring Fee payments are up to date. The Facility will participate in the Reservation System, commencing

with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number the opportunity to make reservations for other lodging chains in the United States.

4.3 **Marketing.**

4.3.1 We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs, and related activities, production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from System Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System franchisees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4 **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances. We will permit existing facilities to convert to Chain Facilities after January 1, 2001, only if a majority of the Chain's official advisory board or committee that we establish, or if no such board then exists, the franchisees of a majority of the Chain Facilities then open or under development so approve. We will authorize only facilities constructed to be Chain Facilities to open under the System before that date.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations

WINEXHIC1 5-98
51973

under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives.

**4.7  System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time.

**4.8  Inspections and Audits.**  We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We may access the reports and data stored in the Facility's property management system provided that we do not unreasonably interfere with the normal functioning of the property management system. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.8. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

**5.  Term.**  The Term begins on the Effective Date and expires on the day prior to the twentieth anniversary of the Opening Date. Some of your duties and obligations will survive termination or expiration of this Agreement. You will execute and deliver to us with this Agreement a notarized Declaration of Franchise Agreement in recordable form. We will countersign and return one copy of the Declaration to you. We may, at our option, record the Declaration in the real property records of the county where the Facility is located. The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

**6.  Initial Fees and Development Allowance.**

**6.1  Application and Initial Fees.**  We will transfer your non-refundable **Application Fee of $1,000.00 from Midlothian, VA**. You will pay us a non-refundable Initial Fee in the amount of **$45,500.00: of which $35,000.00 shall be transferred from Midlothian, VA Wingate Inn Site # 10845, and $10,500.00 shall be due** when you sign this Agreement, which is fully earned when we sign this Agreement.

**6.2  Development Advance.**  We will disburse to you a Development Advance in the amount of **$250,000.00** within 10 days after the Construction Groundbreaking Date, to assist you in paying for the Improvement Obligation. You will be obligated to repay the "Outstanding Development Advance" if the License Terminates before the end of the fifteenth License Year. If the License Terminates because of a Transfer with our consent, and the transferee assumes the obligation to repay the unamortized balance of the Advance, you will not be obligated to repay the Advance unless the transferee fails to pay us when repayment is required. The outstanding Development Advance is the original Development Advance, reduced by 1/15th for each full License Year completed at the time

repayment is due.  You will sign the attached Development Advance Note when you sign this Agreement.  Your principal Equity Interest owners must co-sign the Note.

### 7. Monthly Fees, Taxes and Interest.

7.1    You will pay us certain fees each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) ten days after the month in which they accrue, without billing or demand.  These fees include the following:

7.1.1    A "Royalty" equal to four and five-tenths percent (4.5%) of Gross Room Revenues of the Facility accruing during the calendar month, to compensate us for granting you the License and the opportunity to use the System, accrues from the earlier of the Opening Date or the date you begin operating the Facility under a Mark without our consent.

7.1.2    A "System Assessment Fee" as stated in Schedule C for advertising, public relations, marketing, training, reservation and other related services and programs, accrues from the Opening Date until the end of the Term, including during periods when reservation service is suspended.  After consultation with the official advisory board or committee, if any, and upon 60 days written notice, we may change the System Assessment Fee for all Chain Facilities to cover costs (including reasonable direct and indirect overhead costs) related to such services and programs or to cover the cost of additional services or programs.  You will also pay or reimburse us as described in Schedule C for travel and other sales agent commissions paid for certain reservations at the Facility plus a reasonable service charge, and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet, or other reservation systems and networks.  We may charge Chain Facilities using the System outside the United States for reservation service using a different formula.  We may increase or adjust the System Assessment Fee, travel agent commissions, service charges, and other fees in the future on not less than 60 days prior written notice, provided that you will not be required to pay more than 6% of Gross Room Revenues for the System Assessment Fee.

7.1.3    A "Special Marketing Assessment" as stated in Schedule C for a frequent guest rewards program that we may create or undertake and require participation by all Chain Facilities.

7.2   You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State.  You will pay Taxes to us when due.

7.3   "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4   If a transfer occurs, your transferee or you will pay us our then current Application Fee and a

"Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

## 8. Indemnifications.

8.1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnities harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3  We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1  **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization

to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection. We will provide a Punch List of improvements we will require after we receive the transferee's Application. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for

payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. You are not the third party beneficiary of any contract with a third party to provide services to you under this Agreement, but we are responsible for the performance of all of our obligations to you under this Agreement. We may dissolve, terminate and wind up our business under applicable law but we will transfer the System and this Agreement to a party that will perform the franchisor's obligations and that will assume this Agreement in writing. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1 **Default.** You will be in default under this Agreement if (a) you do not pay us when a payment is due, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section

11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection, you may cure the default within 90 days after the failing inspection. We may terminate the License if you do not perform that improvement agreement.

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1, (2) you discontinue operating the Facility as a "Wingate Inn", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of

the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your Owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest Owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

### 11.3  Casualty and Condemnation.

11.3.1   You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available.  You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations.  You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty.  This restoration will be completed within 180 days after the Casualty.  You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first.  If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13.  You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date.  This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4   **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default.  All System Assessment Fees accrue during the suspension period.  We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards.  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform.  We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory.  You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief.  We may litigate to collect amounts past due under this Agreement without first issuing a default or termination notice.  Our consent or

approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5  **Your Remedies.**  If we do not issue our approval or consent as and when required under this Agreement, within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent.  To the extent permitted by applicable law, this action to compel us to issue our approval or consent shall be your exclusive remedy; and we shall not be liable to you for direct, indirect, special, consequential or exemplary damages, including but not limited to lost profits or revenues.

## 12.  Liquidated Damages.

12.1  **Generally.**  If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Recurring Fees during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term at the date of termination, whichever is less).  If the Facility has been open for less than 24 months, then the amount shall be the average monthly Recurring Fees since the Opening Date multiplied by 24.  You will also pay any applicable Taxes assessed on such payment.  Liquidated Damages will not be less than the product of $2,000.00 multiplied by the number of guest rooms in the Facility.  If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to $1,000 per guest room.  Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement.  Our right to receive other amounts due under this Agreement is not affected.

12.2  **Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us Recurring Fees for a period of one year after we receive the initial notice of condemnation described in Section 11.3, or until the Condemnation occurs, whichever is longer.  You will pay us Liquidated Damages equal to the average daily Recurring Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority).  You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but Recurring Fees must be paid when due until Condemnation is completed.

13.  **Your Duties At and After Termination**.  When the License or this Agreement terminates for any reason whatsoever:

13.1  **System Usage Ceases.**  You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.

13.2  **Other Duties.** You will pay all amounts owed to us under this Agreement and the Outstanding Development Allowance within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Wingate Inn", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3  **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4  **Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.9 (as to information relating to the Term, for 2 years after termination), the first two sentences of 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

**14.  Your Representations and Warranties.** You expressly represent and warrant to us as follows:

14.1  **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2  **This Transaction.** You have received, at least 10 business days prior to execution of this Agreement and making any payment to us, our current Uniform Franchise Offering Circular for prospective franchisees. Neither we nor any person acting on our behalf has made any oral or written representation or promise to you that is not written in this Agreement on which you are relying to enter into this Agreement. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement. You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary

approvals of your owners, Board of Directors and lenders.  Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application.  You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

14.3  **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15.  Proprietary Rights.

15.1  **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2  **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. You covenant that you will not, directly or indirectly through an affiliate, use the design embodied in the Basic Plans to design, construct or modify any structure other than a Chain Facility. You acknowledge that the Basic Plans include non-functional trade dress that is an integral part of the System and you covenant that you will not, directly or indirectly through an affiliate, use the trade dress in any structure that is not a Chain Facility. No good will shall attach to any secondary designator that you use.

15.3  **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or franchisee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and

services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4  **Confidential Information.**  You will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). You will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5  **Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6  **Prior User.**  If you are unable to name the Facility "Wingate Inn" because a pre-existing user has senior rights in your hotel trading area, then your sole and exclusive remedy against us will be to terminate this Agreement and receive a refund of the Initial Fee and the Royalties paid prior to termination. You must give us 15 days prior written notice of termination in that circumstance.

### 16. <u>Relationship of Parties</u>.

16.1  **Independence.**  You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2  **Joint Status.**  If you comprise two or more persons or entities (notwithstanding any agreement,

arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. **Legal Matters.**

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), that part or provision will not be given effect. If any part of this Agreement, for any reason, is declared invalid or unenforceable, the remainder shall not be effected. However, if in our judgment such decision substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective.

17.3 **Notices.** Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party at its address stated below or as may be otherwise designated by notice. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

**Hermis Corporation**:
Your address: **2607 Annakay Crossing, Midlothian, VA 23113**, Fax No.**(804) 379-5225**, Attention: **Bharat Shah**

**Wingate Inns International, Inc.**:
Our address:   6 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278, Fax No. (973) 496-5359, Attention: Vice President-Franchise Administration

17.4 **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement. You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies between you and us or under this Agreement.

17.5 **Miscellaneous.** This Agreement will be governed by and construed under the laws of the State of New Jersey. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey. This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section

headings in this Agreement are for convenience of reference only.  We may unilaterally revise Schedule C under this Agreement. This Agreement, together with the exhibits and schedules attached, is the entire agreement (superseding all prior representations, agreements and understandings, oral or written) of the parties about the Facility.

**17.6  Waiver of Jury Trial. The parties waive the right to a jury trial in any action related to this Agreement or the relationship between the franchisor, the franchisee, any guarantor and their respective successors and assigns.**

**17.7  Special Acknowledgements.**

**17.7.1  You received our Uniform Franchise Offering Circular ("UFOC") for prospective franchisees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

**17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.**

**17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.**

**17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.**

**17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

**18.  Special Stipulations.**  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

**18.1  Transfer Rights.**  If you are not in default under this Agreement, at any time before the end of the six month anniversary of the first License Year, you may assign this Agreement at the same time as you convey the Facility to an entity in which you or the persons listed on Schedule B as the original owners of your Equity Interests are to be owners of at least 51% of the Equity Interests of the entity and retain control over the entity so that change of control, as defined in an Equity Transfer (Appendix A) does not occur.  The transferee and you must sign and deliver to us the Assignment and Assumption Agreement in the form attached as Exhibit D before you transfer the Facility.  No Application or Relicense Fees will be charged.  The accounts of the transferee and you

must be current at the time of transfer, or we will not recognize the transfer. The transferee must submit an application on our standard form and its organizational agreement or charter with the Assignment and Assumption Agreement. We will not recognize the transfer as effective until these documents are completed and delivered to us. The transferee must send us a copy of the warranty deed conveying the Facility within 30 days after its delivery.

## THE BALANCE OF THIS PAGE IS INTENTIONALLY BLANK

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
**WINGATE INNS INTERNATIONAL, INC.**

By: _____
         Vice President

Attest: _____
              Assistant Secretary

**YOU, as Franchisee:**
**HERMIS CORPORATION**

By: _____
         (Vice) President

Attest: _____

APPENDIX A

DEFINITIONS

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Approved Supplier means a vendor authorized by us to provide proprietary or Mark-bearing items, or whose goods and services are deemed to meet applicable System Standards.

Basic Plans means the prototype drawings and specifications (architectural, structural, mechanical, plumbing, electrical and interiors), reflecting the overall design intent, FF&E, and color schemes for a Facility, that we deliver to you after the Effective Date. The Basic Plans do not include a project manual and are not appropriate for a specific Facility.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Declaration means the Declaration of Franchise Agreement you and we sign under Section 5.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Development Advance means the amount advanced to you after the Opening Date under Section 6.2., if applicable.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Wingate Inn facilities located outside the United States, Canada and Mexico.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties constructed at the Location, as modified with our consent.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnities means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.1.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means the one year period beginning on the Opening Date and each subsequent anniversary of the Opening Date and ending on the day preceding the next anniversary of the Opening Date.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at **1 Thunderbolt Place, Chantilly, VA 22021**, as more fully described in Schedule A.

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnities, including guest refunds, or (ii) incurred by any and all Indemnities to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Wingate Inn" and other marks; and (ii) trademarks, trade names, trade dress, logos and derivations,

and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Material Renovation means the upgrading, updating, modifications, replacements, additions, repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Material Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades, updates, improvements, repairs, repainting, refurbishing and replacements we prepare and require as part of the Transfer process.

Protected Territory means **a three (3) mile radius from the front door of the Facility.**

Recurring Fees means the Royalties and System Assessment Fees as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System  or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Special Marketing Assessment means the fee you pay us under Section 7.1.3 and Schedule C for a frequent guest rewards program or other special marketing programs that we may create or undertake and require participation by Chain Facilities.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify, which at present includes only the following: (a) the Marks; (b) other intellectual property, including   Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fee means the fee charged under Section 7.1.2 and Schedule C to pay for the cost of the System's marketing, advertising, public relations, Reservation System, training and other services.

System Standards means the standards for the participating in the Chain and using the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.
Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a

WINEXHCI 5/98
5197 F

26

Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Wingate Inns International, Inc., a Delaware corporation, its successors and assigns.

## SCHEDULE A

(Legal Description of Facility)

## SCHEDULE B

*PART I:  YOUR OWNERS*

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| Bharat Shah | 12.5% | Common Stock |
| Ashok Patel | 12.5% | Common Stock |
| Vinod Trehan | 12.5% | Common Stock |
| Dharam Bains | 12.5% | Common Stock |
| Gopinath Jadhav | 12.5% | Common Stock |
| Harry Bawa | 12.5% | Common Stock |
| Shirish Mehta | 12.5% | Common Stock |
| Mahendra Amin | 12.5% | Common Stock |

*PART II:  THE WINGATE INN FACILITY:*

Number of approved guest rooms: **130**

Parking facilities (number of spaces, description): **130**

Other Amenities, services and facilities:
**Meeting Room** with approximately 40 places;
**Board Room** with approximately 12 places;
**Indoor Whirlpool** or Hot Tub;
**Exercise Room** with machines required by System Standards Manual;
**Business Center** with facsimile machine, copier with collating capability, and personal computer printer capable of printing MS-DOS documents created under popular word processing and spreadsheet software;
Multi-Systems, Inc. Property Management System;
Telephone System with Lucent Guestworks switch.

Guest Rooms
All guest rooms will be equipped with the following, except as modified by changes in System Standards:
Two-line (2 unique station lines) touch tone telephone with data port, speaker and conference call features and separate cordless telephone;
25" color television with portable remote control, cable/satellite television programming with Cable News Network, sports channel, The Weather Channel or equivalent and at least one premium movie channel;
Coffee maker with two cups, regular and decaffeinated coffee and condiments;
Alarm clock/radio;
Individually controlled thermostat;
Keyed or programmable locking steel safe for valuables;
High-mounted, multi-stream shower in combination bathtub/shower;
Electronic guest room lock system, integrated with PMS.

**SCHEDULE C**

May 1998

System Assessment Fees and Other Fees

The System Assessment Fee is 4.00% of Gross Room Revenues.

The GDS Fee described in Section 7 is $4.00 per gross reservation communicated through the Global Distribution System and $2.50 per reservation booked through the Internet. The travel agent commission described in Section 7 is 10% of the Gross Room Revenues generated by each reservation originated by a travel agent, plus our service charge of .75% of the commissionable revenue. The general sales agent commission (also known as international sales office commission) is 5% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office.

We reserve the right to increase or modify the System Assessment Fee (subject to the limit imposed under Section 7.1.2) and any other fee and to add other fees and charges for new services, in our sole discretion as to amount or formula from time to time but with at least 60 days prior written notice, to reflect changes in the fully allocated costs of providing Reservation System services, to add, drop or modify the types of reservation services offered, and to provide the funds reasonably necessary or appropriate for the Chain's marketing, public relations and training programs.

Special Marketing Assessment

The Wingate Inn Frequent Traveler Club requires the guest to present a membership card at any Chain Facility. Each Chain Facility must distribute the membership card to any guest requesting the same. The guest presents the membership card to be stamped at the front desk for each paid roomnight of the guest. Each Chain Facility must stamp the card as instructed in the program instructions. When the member has received 9 stamps, the member may exchange the card for either a Free Night Certificate or a Mileage Certificate good for either 2,500 American Airlines AAdvantage® Miles or Continental Airlines OnePass® miles. The member will be issued a Free Night Certificate that must be honored for room charges by the redeeming Chain Facility. The redeeming Chain Facility will then send the Free Night Certificate to the designated redemption service center for reimbursement at the rate of $65.00 per Free Night Certificate. Each Chain Facility that stamps the card will be charged either $7.25 per stamp for a redeemed Free Night Certificate or $5.56 per stamp for an issued Mileage Certificate. The Franchisee of the Chain Facility must pay for the stamp redemptions when invoiced. We may offset Free Night Certificate reimbursements against stamp charges and pay each Chain Facility net of stamp charges.

Guests must complete stays and have the membership cards stamped by October 31, 1999. Members must redeem each completed card for a Free Night Certificate or Mileage Certificate by December 31, 1999.

We may extend or modify this program.

WINEXHCL 5/98
51953

## GUARANTY

To induce Wingate Inns International, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and the Development Advance Note, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Sections 17.4 (remedies, choice of venue and consent to jurisdiction) and 17.6 (Waiver of Jury Trial), applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

Witnesses:

_____

_____

_____

_____

_____

_____

_____

_____

Guarantors:

_____
**Bharat Shah, Individually**

_____
**Ashok Patel, Individually**

_____
**Vinod Trehan, Individually**

_____
**Dharam Bains, Individually**

_____
**Gopinath Jadhav, Individually**

_____
**Harry Bawa, Individually**

_____
**Shirish Mehta, Individually**

_____
**Mahendra Amin, Individually**

WINEXHC1 5/98
51973

31

# EXHIBIT B

## AMENDMENT TO FRANCHISE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this _28_ day of _Oct_, 2013, ("Amendment Date") by and between **WINGATE INNS INTERNATIONAL, INC.,** a Delaware corporation ("we", "us" or "our"), **HERMIS INC., a Virginia corporation** ("you", or "your"), and Barat Shah, Ashok Patel, Vinod Trehan, Dharm Bains, Gopinath Jadhav, Harry Bawa, Mahendra Amin and Mona B. Patel (the "Guarantors"). This Amendment supplements that certain Franchise Agreement dated December 30, 1998 and amended on March 12, 2007 and further amended on October 11, 2011 (the "Franchise Agreement"), relating to a license to operate a Wingate® System Unit located at 3940 Centerview Drive, Chantilly, VA, designated as Unit #**11962-84569-01**(the "Facility"). To the extent of any conflict between the Franchise Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1.  The Franchise Agreement is amended by extending the Term.  The Term of the Franchise Agreement shall expire on January 1, 2026.

2.  The Franchise Agreement is amended by adding a Section 18.4 to read as follows:

You will receive $150,000.00 as a credit to your account to be used to offset existing and future fees due to us, provided you and your Guarantors sign and return to us the attached Promissory Note. The amortization period for this Promissory Note will begin on January 1, 2021, and at each subsequent anniversary of the Opening Date the amount of the Promissory Note will reduce by 1/5th of the original amount. The Promissory Note is a credit that is not subject to repayment unless the Franchise terminates before the end of the Term of the Agreement or a Transfer occurs. If that happens, you will repay the balance of the Promissory Note.

3.  Confidentiality. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

4.  Release. You and Guarantors, on behalf of yourselves, your partners, officers, employees, directors, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders,

representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the Franchise Agreement for the Facility.

5. Except as expressly stated in this Amendment, no further additions, modification or deletions to the Franchise Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

6.   Execution in Counterparts. To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts. All counterparts shall collectively constitute a single agreement. It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

O-2

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**WINGATE INNS INTERNATIONAL, INC.**

By: _____
Michael Piccola, SVP
Contracts Administration,
Compliance & Quality Assurance

**HERMIS, INC.**

By: _____
**(Vice) President**

**GUARANTORS:**

By: _____
**BHARAT SHAH**

By: _____
**ASHOK PATEL**

By: _____
**VINOD TREHAN**

By: _____
**GOPINATH JADHAV**

By: _____
**DHARM S. BAINS**

By: _____
**HARRY BAWA**

By: _____
**MAHENDRA ~~PATEL~~** I AMIN

By: _____
**MONA B. PATEL**

3

# EXHIBIT C

## AMENDMENT TO FRANCHISE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this 11 day of October 2011, ("Amendment Date") by and between **WINGATE INNS INTERNATIONAL, INC.,** a Delaware corporation ("we", "us" or "our"), and **HERMIS INC.,** a Virginia corporation ("you", or "your"), and Bharat Shah, Ashok Patel, Vinod Trehan, Dharm S. Bains, Harry Bawa, Mahendra Patel and Mona B. Patel (the "Guarantors"). This Amendment supplements that certain Franchise Agreement dated December 30, 1998 (the "Franchise Agreement"), relating to a license to operate a Wingate® System Unit located at 3940 Centerview Drive, Chantilly, Virginia, designated as Unit #**11962-84569-01** (the "Facility"). To the extent of any conflict between the Franchise Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1. The Franchise Agreement is amended by adding a Section 18.2 to read as follows:

18.2. **Special Royalty Rates.** Notwithstanding Section 7.1.1, Franchisee will pay a Royalty to us at the rates set forth in this Section, provided that the Facility remains in good standing throughout this Agreement:

18.2.1 The Royalty shall be four and one half percent (4.5%) of Gross Room Revenues accruing each calendar month from the Opening Date through the Term of the Agreement; however, commencing on the Amendment Date and continuing through August 31, 2012 (the "Deferral Period"), we will defer the payment of one and one half percent (1.5%) of the Royalty ("Deferred Royalty"); and

18.2.2 You will pay the total Deferred Royalty accruing during the Deferral Period in 12 consecutive equal monthly installments commencing on September 1, 2012 and continuing until August 31, 2013; and

18.2.3 The Royalty shall be computed and paid at the rates specified in Section 7.1.1 with no deferral of Royalty commencing on September 1, 2012 and continuing through the remainder of the Term.

18.2.4 Notwithstanding the above Special Royalty Rate, in the event there is an early termination of the Franchise Agreement and Liquidated Damages are due and owing under Section 12.1 hereof, the Royalty fee set forth in Section 7.1.1 hereof and not the Special Royalty Rate set forth in this Section 18.2, shall be used to calculate amounts owed pursuant to Section 11.

2.     The Franchise Agreement is amended by adding a Section 18.3 to read as follows:

**18.3   Interest.**   Notwithstanding Section 7.3,   for the period commencing on the Amendment Date until September 1, 2012, we agree that interest shall not accrue on any unpaid Recurring Fees until 90 days after such fees are due.  After September 1, 2012, "Interest" is payable pursuant to section 7.3.

3.   <u>Confidentiality</u>. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

4.   <u>Release</u>. You and Guarantors, on behalf of yourselves, your partners, officers, employees, directors, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders, representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the Franchise Agreement for the Facility.

5.   Except as expressly stated in this Amendment, no further additions, modification or deletions to the Franchise Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

6.   <u>Execution in Counterparts</u>. To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts. All counterparts shall collectively constitute a single agreement. It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

WINGATE INNS INTERNATIONAL, INC.

By: _____
   Valerie Capers Workman
   Vice President

HERMIS, INC.

By: _____
   (Vice) President

GUARANTORS:

By: _____
   **BHARAT SHAH**

By: _____
   **ASHOK PATEL**

By: _____
   **VINOD TREHAN**

By: _____
   **DHARM S. BAINS**

4

**GUARANTORS:**

By: _____
    **HARRY BAWA**

By: _____
    **MAHENDRA ~~PATEL~~ I. AMIN**

By: _____
    **MONA B. PATEL**

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**WINGATE INNS INTERNATIONAL, INC.**

By: _____
        Valerie Capers Workman
        Vice President


**HERMIS, INC.**

By: _____
        (Vice) President


**GUARANTORS:**

By: _____
        **BHARAT SHAH**

By: _____
        **ASHOK PATEL**

By: _____
        **VINOD TREHAN**

By: _____
        **DHARM S. BAINS**


4

(Page 6 of 9)

GUARANTORS:

By:_____
       HARRY BAWA


By:_____
       MAHENDRA PATEL

By: _Mona B Patel_____
       MONA B. PATEL

5

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

WINGATE INNS INTERNATIONAL, INC.

By: _____
    Valerie Capers Workman
    Vice President


HERMIS, INC.

By: _____
    **(Vice) President**


**GUARANTORS:**

By: _____
    **BHARAT SHAH**


By: _____
    **ASHOK PATEL**


By: _____
    **VINOD TREHAN**

By: _____
    **DHARM S. BAINS**

4

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

WINGATE INNS INTERNATIONAL, INC.

By: _____
Valerie Capers Workman
Vice President

HERMIS, INC.

By: _____
(Vice) President

GUARANTORS:

By: _____
BHARAT SHAH

By: _____
ASHOK PATEL

By: _____
VINOD TREHAN

By: _____
DHARM S. BAINS

By: _____
GOPINATH R JADHAV

4

GUARANTORS:

By: _____
     HARRY BAWA


By: _____
     MAHENDRA PATEL

By: _____
     MONA B. PATEL

5

# EXHIBIT D

## AMENDMENT TO FRANCHISE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this *12th* day of *March*, 2007, ("Amendment Date") by and between **WINGATE INNS INTERNATIONAL, INC.,** a Delaware corporation ("we", "us" or "our"), **HERMIS INC.,** a Virginia corporation ("you", or "your"), and Bharat Shah, Ashok Patel, Vinod Trehan, Dharm S. Bains, Gopinath Jadhav, Harry Bawa, Mahendra Amin and Mona B. Patel (the "Guarantors"). This Amendment supplements that certain Franchise Agreement dated December 30, 1998 (the "Franchise Agreement"), relating to a license to operate a Wingate® System Unit located at  3940 Centerview Drive, Chantilly, VA 20151, designated as Unit #**11962-84569-01** (the "Facility"). To the extent of any conflict between the Franchise Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1.      Schedule B to the Franchise Agreement is amended as follows:

PART I:      YOUR OWNERS.

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|------------------------|
| Bharat Shah | 14.29% | Common Stock |
| Ashok Patel & Maya Patel | 14.285% | Common Stock |
| Vinod Trehan | 14.285% | Common Stock |
| Dharm S. Bains | 14.285% | Common Stock |
| Gopinath Jadhav & Rama Jadhav | 14.285% | Common Stock |
| Harry Bawa & Toffee Bawa | 14.285% | Common Stock |
| Mahendra Patel & Mona B. Patel | 14.285% | Common Stock |

2.      You agree to execute the attached revised Guaranty, designated as "Exhibit A," in conjunction with the execution of this Amendment.

3. Confidentiality. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain

confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

4.    Release. You and Guarantors, on behalf of yourselves, your partners, officers, employees, directors, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders, representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the Franchise Agreement for the Facility.

5.    Except as expressly stated in this Amendment, no further additions, modification or deletions to the Franchise Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

6.    Execution in Counterparts. To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts. All counterparts shall collectively constitute a single agreement. It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

Remainder of page intentionally left blank

(Page 3 of 16)

MCCG, PC                Fax:804-782-2130         Mar 12 2007  15:53     P.04

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

                                          WINGATE INNS INTERNATIONAL, INC.

Attest:_____      By:_____
        (Assistant) Secretary            Richard M. Saltzman
                                          Vice President
                                          Franchise Administration


                                          HERMIS INC.

Attest:_____      By:_____
                                     Name:_____
                                              President


                                          GUARANTORS:

Witness:_____      By:_____
                                              Bharat Shah

Witness:_____      By:_____
                                              Ashok Patel

Witness:_____      By:_____
                                              Vinod Trehan

Witness:_____      By:_____
                                              Dharm Bains

Witness:_____      By:_____
                                              Gopinath Jadhav

                                          3

(Page 4 of 16)

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**WINGATE INNS INTERNATIONAL, INC.**

Attest:_____   By:_____
    (Assistant) Secretary
                             Richard M. Saltzman
                             Vice President
                             Franchise Administration

**HERMIS INC.**

Attest: _Shah B.A_   By:_____
                        Name:_____Ashok_____Patel___
                             President

**GUARANTORS:**

Witness: _Catherine C. Agnes_   By: _Shah B.R_____
                             Bharat Shah

Witness: _Catherine C. Agnes_   By: _____
                             Ashok Patel

Witness:_____   By:_____
                             Vinod Trehan

Witness:_____   By:_____
                             Dharm Bains

Witness: _Catherine C. Agnes_ By: _____
                             Gopinath Jadhav

3

02/28/2007  21:31    4102961590              PRESTON PARTNERS INC              PAGE  02/11
                                                                                    P. 02
MAR-01-07 05:33 AM

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

WINGATE INNS INTERNATIONAL, INC.

Attest: _____    By: _____
       (Assistant) Secretary              Richard M. Saltzman
                                          Vice President
                                          Franchise Administration

**HERMIS INC.**

Attest: _____    By: _____
                                      Name: _____
                                                   President

**GUARANTORS:**

Witness: _____    By: _____
                                          Bharat Shah

Witness: _____    By: _____
                                          Ashok Patel

Witness: _____    By: _____
                                          Vinod Trehan

Witness: _____    By: _____
                                          Dharm Bains

Witness: _____    By: _____
                                          Gopinath Jadhav

3

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**WINGATE INNS INTERNATIONAL, INC.**

Attest: _____    By: _____
(Assistant) Secretary                     Richard M. Saltzman
                                          Vice President
                                          Franchise Administration

**HERMIS INC.**

Attest: _____    By: _____
                                      Name: _____
                                                   President

**GUARANTORS:**

Witness: _____   By: _____
                                          Bharat Shah

Witness: _____   By: _____
                                          Ashok Patel

Witness: _____   By: _____
                                          Vinod Trehan

Witness: _Sasujit Bains_   By: _____
                                          Dharm Bains

Witness: _____   By: _____
                                          Gopinath Jadhav

3

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**WINGATE INNS INTERNATIONAL, INC.**

Attest:_____   By:_____
(Assistant) Secretary                     Richard M. Saltzman
                                          Vice President
                                          Franchise Administration

**HERMIS INC.**

Attest:_____   By:_____
                                  Name:_____
                                                 President

**GUARANTORS:**

Witness:_____   By:_____
                                          Bharat Shah

Witness:_____   By:_____
                                          Ashok Patel

Witness:_____   By:_____
                                          Vinod Trehan

Witness:__Sarujit Bains__ By:_____
                                          Dharm Bains

Witness:_____   By:_____
                                          Gopinath Jadhav

3

Witness: _Catherine C Agnes_   By: _____Harry Bawa._____
                                       Harry Bawa

Witness: _____   By: _____
                                       Mahendra Amin

Witness: _____   By: _____
                                       Mona B. Patel

4

Feb 28 07 04:17p     M I Amin                    2693270913                    p.2

Witness:_____     By:_____
                                     Harry Bawa

Witness: _Kooshi Gardner_     By: _Mahendra Amin_
                                     Mahendra Amin

Witness:_____     By:_____
                                     Mona B. Patel

4

02/28/2007 WED 9:17 FAX 4045150263 coca cola                    @002/004

Witness:_____     By:_____
                                   Harry Bawa


Witness:_____     By:_____
                                   Mahendra Amin


Witness:_____     By:_____
                                   Mona B. Patel

4

## GUARANTY

To induce Wingate Inns International, Inc., its successors and assigns ("you") to sign the Amendment to the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and any Development Incentive Note, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

Witnesses:                                              **GUARANTORS:**

_Catherine C. Ayres_                           _Sheh B. R._
                                                               Bharat Shah

_Catherine C. Ayres_                           _A. R. Patel_
                                                               Ashok Patel

_____                   _____
                                                               Vinod Trehan

_____                   _____
                                                               Dharm Bains

_Catherine C. Ayres_                           _Gopinath Jadhav_
                                                               Gopinath Jadhav

5

02/28/2007  21:31    4102961590          PRESTON PARTNERS INC          PAGE  03/11
                                                                        P.03
MAR-01-07 05:34 AM

## GUARANTY

To induce Wingate Inns International, Inc., its successors and assigns ("you") to sign the Amendment to the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and any Development Incentive Note, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

Witnesses:                              GUARANTORS:

_____                _____
                                        Bharat Shah

_____                _____
                                        Ashok Patel

                                        _____
                                        Vinod Trehan

_____                _____
                                        Dharm Bains

_____                _____
                                        Gopinath Jadhav

5

# GUARANTY

To induce Wingate Inns International, Inc., its successors and assigns ("you") to sign the Amendment to the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and any Development Incentive Note, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**Witnesses:**

**GUARANTORS:**

_____

Bharat Shah

_____

Ashok Patel

_____

Vinod Trehan

_____

Dharm Bains

_____

Gopinath Jadhav

5

(Page 14 of 16)

_Catherine C. Ayres_

_____

_____

_____
Harry Bawa

_____
Mahendra Amin

_____
Mona B. Patel

6

Feb 28 07 04:17p    M I Amin                    2693270913              p.3

Keeshi Gardner
_____

_____

_____
Harry Bawa

Mahendra Amin
Mahendra Amin

_____
Mona B. Patel

6

02/28/2007 WED 9:17  FAX 4045150263 coca cola                                    ☑003/004

_____

_____                         Harry Bawa
                                                _____

_____                         Mahendra Amin

                                                Mona B. Patel
                                                _____
                                                Mona B. Patel

# EXHIBIT E

## GUARANTY

To induce Wingate Inns International, Inc., its successors and assigns ("you") to sign the Amendment to the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and any Development Incentive Note, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

Witnesses:

_____

_____

_____

_____

GUARANTORS:

_____
Bharat Shah

_____
Ashok Patel

_____
Vinod Trehan

_____
Dharm Bains

_____
Gopinath Jadhav

5

02/28/2007  21:31    4102961590          PRESTON PARTNERS INC          PAGE  03/11

                                                                      P.03

MAR-01-07 05:34 AM

## GUARANTY

To induce Wingate Inns International, Inc., its successors and assigns ("you") to sign the Amendment to the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we," "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and any Development Incentive Note, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**Witnesses:**                                    **GUARANTORS:**

                                                  _____
                                                  Bharat Shah

                                                  _____
                                                  Ashok Patel

_____                           _____
R.J. Evans                                        Vinod Trehan

                                                  _____
                                                  Dharm Bains

_____                           _____
                                                  Gopinath Jadhav

5

## GUARANTY

To induce Wingate Inns International, Inc., its successors and assigns ("you") to sign the Amendment to the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments and any Development Incentive Note, will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

Witnesses:                                          GUARANTORS:

_____                     _____
                                                    Bharat Shah

_____                     _____
                                                    Ashok Patel

_____                     _____
                                                    Vinod Trehan

_Sarujt Bains_                              _____
                                                    Dharm Bains

_____                     _____
                                                    Gopinath Jadhav

5

_____

_____

_____

_____
Harry Bawa

_____
Mahendra Amin

_____
Mona B. Patel

Feb 28 07 04:17p    M I Amin                    2693270913              p.3

_____                    _____
                                             Harry Bawa

Keoshi Gardner                               Mahendra Amin
                                             _____
                                             Mahendra Amin

_____                    _____
                                             Mona B. Patel

6

(Page 16 of 16)

02/28/2007 WED 9:17 FAX 4045150263 coca cola                    ☒003/004

_____        Harry Bawa
                                 _____

_____        Mahendra Amin
                                 _____

_____        Mona B. Patel
                                 _____
                                 Mona B. Patel

6

# EXHIBIT F

## DEVELOPMENT ADVANCE NOTE

**$250,000.00**                                                    Parsippany, New Jersey
                                                                   Date: 12-30-98

FOR VALUE RECEIVED, the undersigned **Hermis Corporation, a _____ corporation** ("Maker") promises to pay to the order of WINGATE INNS INTERNATIONAL, INC., a Delaware corporation ("Holder"), the principal sum of **TWO HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($250,000.00)** which amount shall bear no interest unless Maker defaults or this Note is accelerated. The principal amount will be disbursed by Holder to Maker, and Maker will become subject to the obligation to repay or discharge this Note, when and if Maker opens the Facility in accordance with the Franchise Agreement, as described below. On each anniversary of the Facility's Opening Date, one-fifteenth of the original principal amount will be forgiven without payment. Maker's obligation to repay the principal of this Note will cease and this Note will be cancelled and discharged when the principal is completely forgiven. If this Note is accelerated and is not paid within ten (10) days after it is due, the outstanding principal balance shall bear simple interest at a rate equal to the lesser of eighteen (18%) percent per annum or the highest rate allowed by applicable law from its due date until paid. Principal shall be payable in lawful money of the United States of America at 6 Sylvan Way, Parsippany, New Jersey 07054, or at such other place as Holder may direct by written notice to Maker, if a Termination of the License granted under the Franchise Agreement between Maker and Holder occurs for any reason prior to the fifteenth anniversary of the Opening Date of the Facility, or a Transfer occurs and the transferee does not assume Maker's obligation under this Note in a writing acceptable to Holder prior to the closing of the Transfer. If such Termination or Transfer occurs, the outstanding principal balance of this Note shall be immediately due and payable without further notice, demand or presentment. Any payments shall be first applied to any accrued interest and then to principal. Maker has the right to prepay this Note, in whole or in part, at any time, without premium or penalty. Prepayments of principal will be applied without notation on this Note.

This Note is issued pursuant to the Franchise Agreement between Holder and Maker for the construction and operation of a Wingate Inn facility (the "Facility") to be located at **1 Thunderbolt Place, Chantilly, Virginia**. All terms not defined herein shall have the same definition as in the Franchise Agreement. If the Franchise Agreement terminates before the Facility opens and Holder does not disburse the Development Advance to Maker, then this Note will be deemed discharged and neither party will have any further obligation to the other under this instrument. Maker's obligation to pay this Note shall be absolute and unconditional, and all payments shall be made without setoff, deduction, offset, recoupment or counterclaim.

If this Note is collected by or through an attorney at law, the Holder shall be entitled to collect reasonable attorney's fees and all costs of collection. This Note shall be governed and construed according to the laws of the State of New Jersey (without the application of conflict of laws principles). Each maker, endorser, guarantor or accommodation party liable for this Note waives presentment, demand, notice of demand, protest, notice of non-payment, notice of protest, notice of dishonor and diligence in collection. Holder reserves the right to modify the terms of this Note, grant extensions, novations, renewals, releases, discharges, compositions, and compromises with

WINEXHC1 3/98

any party liable on this Note, with or without the consent of, notice to, and without discharging or affecting the obligations of, any other party liable under this Note.   The terms "Holder" and "Maker" shall be deemed to include their respective heirs, successors, legal representatives and assigns, whether by voluntary action of the parties or by operation of law.   All references to "Maker" shall mean and include the named Maker and all co-makers, guarantors, sureties and accommodation parties signing or endorsing this Note, each of whom shall be jointly and severally liable for the payment of this Note.

IN WITNESS WHEREOF, the undersigned have executed this instrument effective as of the date first above written.

**WITNESS:**

_____

**MAKER:**
**HERMIS CORPORATION**

(Vice) President

**CO-MAKERS:**

**Bharat Shah, Individually**

**Ashok Patel, Individually**

**Vinod Trehan, Individually**

**Dharam Bains, Individually**

**Gopinath Jadhav, Individually**

**Harry Bawa, Individually**

**Shirish Mehta, Individually**

**Mahendra Amin, Individually**

WINEXHCI 3/98

# EXHIBIT G

PROMISSORY NOTE

$150,000.00                                                    Parsippany, New Jersey
                                                              10|28| __, 2013

FOR VALUE RECEIVED, HERMIS, INC. ("Maker") and Bharat Shah, Ashok Patel, Vinod Trehan, Dharm
Bains, Gopinath Jadhav, Harry Bawa, Mahendra Amin and Mona B. Patel, (collectively, "Co-Makers")
promise to pay to the order of **Wingate Inns International, Inc.,** a Delaware corporation ("Holder"), in the
manner hereinafter specified, the principal sum of One Hundred Fifty Thousand Dollars and Zero Cents
($150,000.00). This Promissory Note ("Note") is issued in connection with the October 28 __,
2013 ("Amendment Date"), Amendment to the Franchise Agreement dated December 30, 1998, between
Maker and Holder ("Agreement"), relating to a Wingate guest lodging facility located at 3940 Centerview
Drive, Chantilly, VA designated as Unit #**11962-84569-01** (the "Facility").

**On the first of each year for a period of five years commencing on January 1, 2021, one-fifth of the
original principal amount will be forgiven without payment. Maker's obligation to pay the
principal of this Note will cease and this Note shall be cancelled on January 1, 2026, if Maker meets
the following conditions: (1) Maker continuously operates the Facility as part of the Wingate
System through the date the Note is cancelled; (2) Maker's franchisee account remains current and
in good standing through the term of the Agreement; and (3) Maker fully complies with all of the
terms of the Amendment.**

**If Maker fails to meet any of the obligations set forth in sections 1-3 above, the principal amount of
this Note minus any amounts previously forgiven, shall be immediately due and payable, without
further notice, demand, or presentment, in lawful money of the United States of America at 22
Sylvan Way, Parsippany, New Jersey, 07054, or at such other place as may hereafter be designated
by written notice from the Holder to the Maker.**

If this Note is not paid within ten (10) days after the same becomes due, the balance of this Note shall bear
simple interest at a rate equal to the lesser of eighteen percent (18%) per annum or the highest rate allowed by
law, from its due date until paid. Any payments as provided for herein shall be first applied to any accrued
interest and then to principal. Makers have the right to prepay this Note, in whole or in part, at any time,
without premium or penalty. Prepayments of principal will be applied without notation thereon.

If Maker becomes insolvent or any suit or proceeding is commenced against it alleging that it is insolvent,
unable to pay its debts as they mature, or not generally paying its debts as they come due; or if any
proceeding be instituted by or against Maker under the Federal Bankruptcy Code or any successor statute,
or seeking the appointment of a receiver or trustee for all or any material portion of Maker's property, or
Maker executes an assignment for the benefit of creditors, or liquidates, merges, sells substantially all of
its assets, or takes any action in contemplation of any such action, then without notice or demand of any
kind, Holder may accelerate the maturity of this Note and the principal of this Note shall be immediately
due and payable.

If this Note is collected by or through an attorney at law, the Holder shall be entitled to collect reasonable
attorneys' fees and all costs of collection. This Note shall be governed and construed according to the
laws of the State of New Jersey. Maker hereby consents and waives all objections to the non-exclusive
personal jurisdiction of, and venue in, the New Jersey state courts situated in Morris County, New Jersey
and the United States District Court for the District of New Jersey for the purposes of all cases and

controversies involving this Note. Each Maker, endorser, guarantor or accommodation party liable herein waives presentment, demand, notice of demand, protest, notice of non-payment, notice of protest, notice of dishonor and diligence in collection. The terms "Holder" and "Maker" shall be deemed to include their respective heirs, legal representatives and assigns, whether by voluntary action of the parties or by operation of law. All references to "Maker" shall mean and include the named Maker and all guarantors, sureties, and accommodation parties signing or endorsing this Note, each of whom shall be jointly, severally and primarily liable as the Maker of this Note.

IN WITNESS WHEREOF, Maker has executed this Note under seal as of the date first above written.

**MAKER:**
**HERMIS, INC.**

_____
Witness

By: _____
    (Vice) President

**CO-MAKERS:**

_____
Witness

_____
Bharat Shah

_____
Witness

_____
Ashok Patel

_____
Witness

_____
Vinod Trehan

_____
Witness

_____
Dharm Bains

_____
Witness

_____
Gopinath Jadhav

_____
Witness

_____
Harry Bawa

_____
Witness

_____
Mahendra Amin

_____
Witness

_____
Mona B. Patel

Date: ___10/10/___, 2013

2